# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 28, 2004

## STATE OF TENNESSEE v. DONNA K. BUCK

**Direct Appeal from the Circuit Court for Blount County**
**No. C-13068      D. Kelly Thomas, Jr., Judge**

---

**No. E2003-02217-CCA-R3-CD - Filed December 30, 2004**

---

The defendant appeals her conviction for first degree premeditated murder.  On appeal, the defendant challenges the sufficiency of the evidence to support the conviction and contends that the trial court erred in disallowing cross-examination of an unavailable witness.  We affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Julie A. Rice, Knoxville, Tennessee; Raymond Mack Garner, District Public Defender; Stacy Nordquist and George Waters, Assistant Public Defenders, for the appellant, Donna K. Buck.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Ellen Berez, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Donna K. Buck, was convicted by a jury for the first degree premeditated murder of Sandra Jones, the victim, and sentenced to life without parole.  The defendant has preserved two issues on appeal:
(1) The evidence is insufficient to support a conviction for first degree murder; and
(2) The trial court erred in disallowing cross-examination of an unavailable witness.
After careful review, we affirm the conviction.

## Factual Background

The factual background of this case is, for the most part, undisputed.  Due to the defendant's conviction, this synopsis of facts will view the evidence in a light most favorable to the State, as we must.  State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

The fateful relationship between the defendant and the victim began in 1996 when they met at a bar in Knoxville. A week later they were living together as lovers. Their relationship subsequently was marked by periods of harmony interrupted by the victim's infidelities followed by rancorous separations. The relationship ended in the early hours of October 13, 2000, when the defendant killed the victim by stabbing her repeatedly.

Approximately nine months before her death, the victim met and began an affair with Stacey Parton. The victim moved in with Ms. Parton but went back and forth between Ms. Parton and the defendant, changing her residence depending on her affiliation. Ms. Parton estimated this occurred three or four times in the nine-month period. This state of affairs exacted an emotional toll on the defendant, and she admitted being angry at the victim during the nine-month period.

Several witnesses testified to statements made by the defendant in which she threatened to kill the victim. Terri Poole, a friend of the defendant, had hosted a small gathering of friends at her home on the Sunday preceding the victim's death. According to Ms. Poole, the defendant made a statement that day, to wit: "I guess I'll just have to kill the bitch to get her out of the way, out of my way." The defendant also told Ms. Poole that killing the victim would provide her room and board, three meals a day, and climate control. Ms. Poole stated on October 12th, prior to the killing, that the defendant had called to tell her she was packing to leave town in order to get away from the victim and the defendant's financial problems.

Another friend of the defendant, Tina Touchstone, testified concerning statements by the defendant at the gathering at Terri Poole's. The defendant had discussed her troubles concerning her relationship with the victim and her personal financial problems. The defendant, according to Ms. Touchstone, said she should just kill her and get it over with. The defendant also said that it would be easier for her concerning her bills and stress and that it would make life more comfortable for her.

Ms. Touchstone recounted a phone conversation with the defendant some four months prior to the victim's death, when the defendant stated she would like to kill the victim and get it over with. Ms. Touchstone had three phone conversations with the defendant on October 12th and 13th. At 5:00 p.m. on the 12th, the defendant expressed concerns about losing her truck through repossession and concerns about other creditors. The defendant also told her she was considering leaving town alone. At 10:00 p.m. that night, the defendant called her saying she was leaving town and requested to stay with Ms. Touchstone for a couple of days before she left. On October 13th, at 3:00 a.m., the defendant called Ms. Touchstone again to tell her that all of the defendant's problems were taken care of and that she would turn herself in to the police. Ms. Touchstone described the defendant's voice as "choppy" and "out of breath."

Janice Agee, a neighbor of the defendant, stated that on "numerous occasions" the defendant had said in reference to the victim, "I guess I will just have to kill the bitch in order to get rid of her." Ms. Agee said these statements were made more than a month before the victim's death. Ms. Agee received a phone call from the defendant at 4:05 a.m. on October 13th. The defendant, in a "deadly calm" voice, told Ms. Agee that she had killed the victim.

Stacey Parton testified that she and the victim had lived together as a couple, with interruptions, during the last nine months of the victim's life. During the intervening periods, the victim returned to live with the defendant. On two occasions, at unspecified times, the defendant had left threatening messages on Ms. Parton's answering machine. Once the message was, "F--k you bitch. If I ever see you again, I'll kill you." The other message from the defendant proclaimed that if she ever saw Ms. Parton and the victim again, the defendant would spend the rest of her life in prison. On October 11th, the defendant left a message on Ms. Parton's answering machine requesting that she and the victim come and pick up the victim's belongings from the defendant's house. Neither Ms. Parton nor the victim responded to this request.

The transcribed testimony of Linda Gribble from the preliminary hearing was introduced due to Ms. Gribble's intervening death. She testified that the defendant had called her two days prior to the victim's death. Ms. Gribble said they were "joking around" and the defendant said she was in a relationship that was "driving her crazy." The defendant said she would "get rid of it one way or the other" and would rather be in jail. The defendant also said she wanted the person causing her problems to stay away or else the defendant "might hurt her."

With the exception of Linda Gribble's testimony, the defendant did not deny making prior statements about killing the victim. The defendant freely admitted during her interview with police that she had made the threat numerous times. The defendant volunteered that she had left a threatening message to both the victim and Stacey Parton on their answering machine within the week. The defendant characterized these statements as "blowing off" and "run[ning] my mouth" but denied any plan to actually kill the victim. The defendant reiterated during her trial testimony that she had often made those types of statements but denied any actual intent to kill the victim. The only threat the defendant denied making was that related by Linda Gribble. The defendant testified that she had not talked to Ms. Gribble in eight years.

The defendant, in her second interview on October 13th, admitted purchasing a fillet knife just two days before. She claimed that she always kept a knife in her truck for protection but bought the fillet knife on impulse, in order to have a sharper knife to carry in her truck. The defendant freely confessed in her statement to police that the fillet knife was the weapon used to kill the victim. When she turned herself in, the defendant had informed police where the knife was located. However, she denied buying the knife for the purpose of killing the victim.

According to the defendant's interviews and court testimony, she had planned to leave for a indefinite period. She had packed clothing and set aside some of the victim's belongings. In a phone conversation, the defendant asked the victim if she wanted to come over. The parties agreed that the victim would park her car at Wal-Mart where the defendant would pick her up. The defendant parked her truck behind her mobile home upon their arrival. These measures were taken to avoid Ms. Parton's detection of their meeting.

The defendant and the victim discussed their relationship and the possibility of the victim going with the defendant or returning to Ms. Parton. The defendant said the argument was not

heated but "more or less a bickering." The defendant said that she was "stressed and aggravated." Eventually, the defendant told the victim that she would take her back to her vehicle at Wal-Mart. While sitting in the defendant's truck, the victim made the statement that the defendant did not love her. The defendant then took the fillet knife from its storage place between the driver's seat and the console and started stabbing the victim. The defendant could not remember how many times she stabbed the victim or the victim defending herself. The defendant said she stopped the stabbing but resumed when she heard the victim breathing. Eventually, the breathing ceased. The defendant carried the victim's body to the back steps of the defendant's residence and then pulled it into the mobile home. The defendant placed the body in the living room floor and crossed the victim's hands. The defendant placed the fillet knife between the dryer and the wall. After making phone calls to Janice Agee and Tina Touchstone, the defendant washed her hands and changed her clothes.

The defendant then drove to the Blount County Justice Center and requested an officer. The defendant gave an account to Michelle Blankenship, a Maryville police officer. Officer Blankenship described the defendant as cooperative and very calm. Other officers were dispatched to the defendant's residence where they found the victim's body and the fillet knife in the locations the defendant had related.

The defendant was interviewed on two different occasions by a detective and an investigator from the Blount County Sheriff's Department. Both interviews were tape recorded and played for the jury. Detective Scott Johnson, one of the defendant's interviewers, testified that during the interviews the defendant was, at times, upset but was calm for the most part.

Dr. David Gilliam, the Blount County Medical Examiner, testified that the cause of the victim's death was multiple, penetrating stab wounds. He said the victim suffered twelve stab wounds in the chest, two in the abdomen, one in the left thigh, and two defensive wounds on the left arm.[1]

### Sufficiency of the Evidence

The defendant maintains that the evidence is insufficient to support the conviction for first degree premeditated murder. She claims that the stabbing of the victim was a result of "passion and excitement" caused by a statement made by the victim. The State contends that the evidence is sufficient and, from our review, we agree with the State.

When the defendant questions the sufficiency of the evidence on appeal, our reviewing standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). In determining sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v.

---

[1] Dr. Gilliam indicated one other stab wound "in the upper right _____" and indicated rather than verbalizing the location.

Cabbage, 571 S.W.2d 832, 835 (1978). We are required to afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). Witness credibility questions were resolved by the jury. Id.

> Tennessee Code Annotated section 39-13-202:
> (a) First degree murder is:
>     (1) A premeditated and intentional killing of another;
>     (d) As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The jury determines whether the element of premeditation is present by an examination of the circumstances surrounding the killing, and our supreme court has enumerated a non-exclusive list of factors which supports the presence of these elements, which includes: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparation beforehand for concealment of the crime, and calmness immediately after the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-42, and State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)).

The facts in this case show that the defendant made repeated statements about killing the victim as recently as two and four days prior to the killing. The defendant's statements also revealed an acknowledgment of the consequences of such a course of action. Two days prior to the victim's death, the defendant bought the fillet knife used to kill the victim. The defendant's stabbing attack on the unarmed victim was unprovoked other than by the victim's statement that the defendant no longer loved the victim. The jury could logically infer that the defendant lured the victim to her house to effect her plan. With the exception of some display of emotion during her interview by the police, the defendant was described as calm by all witnesses who spoke with her immediately after the killing. Although the defendant places a different emphasis on the largely undisputed facts, a rational jury could reasonably find the elements of premeditation, thus justifying their verdict of first degree murder.

**Impeachment of Unavailable Witness**

The defendant next alleges that the trial court erred in failing to permit defense counsel to cross-examine an unavailable witness.

Linda Gribble had formerly testified at the defendant's preliminary hearing. She had died in the intervening time before the trial. The State was allowed, pursuant to Tennessee Rule of Evidence 804(b)(1), to introduce the witness's prior preliminary hearing testimony. The defendant chose not to introduce the preliminary hearing cross-examination of Ms. Gribble.

Ms. Gribble had testified that she had a phone conversation with the defendant two days before the victim's death. The defendant discussed problems she was having with a relationship and stated she would get rid of the problem one way or the other and then turn herself in. The defendant contends that pursuant to Tennessee Rule of Evidence 806, she should have been permitted to call the unavailable declarant, Ms. Gribble, as a witness and pose cross-examination questions to an empty witness chair.

> Tennessee Rule of Evidence 806, states:
> When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

We do not believe the rule contemplates an absurd scenario of questioning an empty witness chair in an attempt to impeach the deceased witness. Such an approach would defy logic and reason.

The defendant introduced the testimony of Kathy Howery who stated that Ms. Gribble, at the time of her statement to police, was, by her own admission, too medicated to remember what she had told police. Ms. Howery also related that during the relevant time period, Ms. Gribble had been sent home from work two or three times due to her over-medicated condition.

The defendant, in her testimony, denied the specific conversation that Ms. Gribble had related and testified that they had not conversed in eight years. Thus, the defendant was able to introduce impeaching evidence to counter the admissible hearsay of Ms. Gribble. We conclude that it was not error for the trial court to disallow the defendant's chosen method of impeachment.

**Conclusion**

For the foregoing reasons, we affirm the defendant's conviction for first degree premeditated murder.

_____
JOHN EVERETT WILLIAMS, JUDGE